FILED
MAY 08 2013
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS OFFICE

IN THE UNITED STATES DISTRICT COURT
FOR SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER 618-954-1016 | Case No. 13-mj-3032-DGW<br><br>**Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Julie E. Neiger, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.  I make this Affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number **618-954-1016** (the "**TARGET TELEPHONE**"), whose service provider is **AT&T Mobility**, a wireless telephone service provider headquartered at 208 South Akard Street, Dallas, Texas. The **TARGET TELEPHONE** is subscribed to and utilized by **MICHAEL N. COOK**. The **TARGET TELEPHONE** is further described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2.  Your Affiant, Julie E. Neiger, is a Special Agent (SA) with the Federal Bureau of Investigation (FBI). Your Affiant has been with the FBI for 10 years. As such, your Affiant is vested with the authority to investigate violations of federal laws, including Titles 18 and 21 of the United States Code. Your Affiant is currently assigned to the Springfield Division of the FBI, Fairview Heights, Illinois Resident Agency, and has primary investigative responsibilities for crimes occurring within the Southern District of Illinois.

3. Information to support this Affidavit is based upon my personal knowledge and experience, as well as upon information, knowledge, and experience supplied to me by other law enforcement officers participating in this investigation and by interviews with witnesses in this case.

4. Based on the facts set forth in this Affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 841(a)(1) and 846 have been committed, are being committed, and will be committed by the user of the **TARGET TELEPHONE**, and other known and unknown persons. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations, and will lead to the identification of individuals who are engaged in the commission of these offenses.

## PROBABLE CAUSE

5. For the reasons set out in this Affidavit, there is probable cause to believe that the offenses of *possession with intent to distribute a controlled substance and conspiracy to distribute and possess with intent to distribute* have been committed, are being committed, and will continue to be committed by **MICHAEL N. COOK**. Further, there is probable cause to believe the user of the **TARGET TELEPHONE** is involved in the conspiracy to distribute and possess with the intent to distribute a controlled substance.

## BACKGROUND OF INVESTIGATION

6. Members of the investigative team and I are investigating Sean D. McGilvery and **MICHAEL N. COOK** for violations of 21 U.S.C. §§ 841(a)(1) and 846. The investigation has shown that **MICHAEL N. COOK** uses the **TARGET TELEPHONE**.

7. Your Affiant further states there is probable cause to believe that signaling information, including cell site information, precision location information, and factory installed

2

Global Positioning System (GPS) information will lead to evidence of the aforementioned criminal offenses, the location of **MICHAEL N. COOK** as well as to the identification of individuals who are engaged in the commission of those criminal offenses and related crimes.

8. On July 29, 2011, Justin D. Cahill (a 36 year old white male) was interviewed pursuant to a proffer agreement in the presence of his attorney. Cahill pled guilty to a charge of Conspiracy to Distribute a Controlled Substance. Cahill told your Affiant that an individual, known to Cahill as Mike "Buck" Reamer, obtained OxyContin pills from Cahill and would then give the pills to **MICHAEL N. COOK**, a St. Clair County Circuit Court Judge. Reamer told Cahill that Reamer arranged for Cahill's fourth criminal case for Driving Under the Influence (DUI) to be assigned to **JUDGE COOK**. During the pending judicial proceedings, **JUDGE COOK** would shuffle Cahill's paperwork to the bottom of the stack. Cahill believed that by supplying more OxyContin pills to Reamer for **JUDGE COOK**, Cahill received less jail time for his felony DUIs. For example, Cahill's third DUI case which was assigned to **JUDGE COOK**, was continued multiple times and took nearly four years to resolve, with Cahill ultimately receiving a sentence of only three months incarceration.

9. Cahill went on to state he supplied cocaine and/or OxyContin pills to James K. Fogarty, a St. Clair County Probation Officer and an unlawful drug user. From May 2010 to October 2010, Cahill and Reamer went to Fogarty's house in Belleville, Illinois, on numerous occasions to deliver drugs. On several of these occasions, Cahill observed several white males at Fogarty's residence. Reamer referred to the white males as "officials." Cahill did not know the individuals, but Reamer identified one as **JUDGE COOK** and one as an individual known as "Christ."

3

10. Your Affiant queried public records and confirmed that on February 8, 2011, Cahill pled guilty to a felony DUI charge and was sentenced by **JUDGE COOK** to 24 months' probation and three months' intensive probation. Cahill also received 51 days credit for time served. Your Affiant also confirmed through public records that on February 19, 2008, Cahill was arrested for a DUI. On March 18, 2008, **JUDGE COOK** set the case for a bench trial. A further review of the records showed the matter was continued 10 times (by multiple judges to include **JUDGE COOK**) before Cahill was found guilty on August 4, 2010. Your Affiant also queried public records and confirmed that **MICHAEL N. COOK** (a 43 year old white male) is a St. Clair County Circuit Court Judge and that James K. Fogarty (a 45 year old white male) is a St. Clair County Probation Officer.

11. Beginning in June, 2012 and continuing thereafter, your Affiant interviewed Cooperating Individual #1 (hereinafter referred to as CI#1). CI#1, a self-admitted former drug user, originally came to law enforcement and provided the information as detailed herein. CI#1 has not been paid, has not been charged with a crime, and is not currently under investigation. CI#1 told your Affiant that CI#1 has seen **JUDGE COOK** use cocaine "hundreds of times." CI#1 has also known **JUDGE COOK** to smoke marijuana and abuse prescription pain medication such as Vicodin or Darvoset. CI#1 has seen **JUDGE COOK** abuse prescription medications on approximately 50 to 60 separate occasions. CI#1 also witnessed **JUDGE COOK** use crack cocaine and marijuana multiple times. CI#1 claimed **JUDGE COOK** has been using drugs for the past 10 years.

12. CI#1 went on to state that Tom Lee, a self-employed plumber from Belleville, Illinois is friends with **JUDGE COOK**. Lee provided **JUDGE COOK** with heroin that Lee

obtained from McGilvery, a heroin and cocaine distributor who lived at 112 South 35th Street in Belleville, Illinois. CI#1 detailed the ways in which Lee acquired heroin from McGilvery. Lee told CI#1 that on one occasion **JUDGE COOK** went with Lee to get cocaine from McGilvery. Lee also stated that in the summer of 2012, one week before leaving for vacation in Hawaii, **JUDGE COOK** had 12 grams of heroin in his possession. Lee told CI#1 that while **JUDGE COOK** was in Hawaii, **JUDGE COOK** met a "dirty doctor" from California who prescribed Percocet to **JUDGE COOK**. Lee also provided additional details of **JUDGE COOK**'s prescription drug abuse.

13.     CI#1 continued, saying CI#1 knew through conversations with Lee that **JUDGE COOK** eventually started obtaining heroin directly from McGilvery, as opposed to using Lee. **JUDGE COOK** received cocaine from McGilvery in early 2012. **JUDGE COOK** met with McGilvery or possibly another person three or four times a week to get drugs. **JUDGE COOK** would only acquire heroin from McGilvery. **JUDGE COOK** and McGilvery have had a "user's relationship" for the past eight years. CI#1 believes **JUDGE COOK** has been getting more than an "8 ball" (an eighth of an ounce) up to a fourth of an ounce of heroin from McGilvery each time. **JUDGE COOK** used heroin at Lee's home four times a week and had access to Lee's home with a key Lee provided **JUDGE COOK**.

14.     In June, 2012, CI#1 witnessed **JUDGE COOK** ingest a line of heroin and a line of cocaine by snorting both substances. In July, 2012, CI#1 witnessed **JUDGE COOK** crushing up Xanax and mixing it with heroin and then ingesting the heroin mixture.

15.     CI#1 provided **JUDGE COOK**'s cellular telephone number as the **TARGET TELEPHONE**.

5

16. CI#1 was aware **JUDGE COOK** was friends with Joe Christ, who CI#1 later learned was an Assistant State's Attorney in St. Clair County, Illinois. CI#1 told your Affiant that Christ was a cocaine user, ingesting the drug by snorting it.

17. Your Affiant queried an internet fee for service database which indicated cellular telephone number 618-954-1016 was subscribed to and/or used by **JUDGE COOK**. Your Affiant queried public records and confirmed that Joe Christ (a 49 year old white male at the time of his death on March 10, 2013) was a St. Clair County Assistant State's Attorney prior to being sworn in as a St. Clair County Associate Circuit Judge. Your Affiant confirmed through public records that Thomas M. Lee Plumbing & Heating is located at 3124 West Main Street in Belleville, Illinois, which was consistent with information previously provided by CI#1.

18. On November 29, 2012, your Affiant interviewed Cooperating Individual #2 (hereinafter referred to as CI#2), a witness who requested to remain anonymous at the time of the interview. CI#2 is a self-admitted former drug user. During the interview, CI#2 provided information which was later corroborated by another witness, Deborah A. Perkins. CI#2 told your Affiant that CI#2 once lived with Perkins, a heroin distributor involved in the distribution of the drug with McGilvery. For that reason, CI#2 was familiar with Perkins and McGilvery's heroin distribution methods. CI#2 told your Affiant that since 2010 McGilvery had been supplied heroin by Perkins a "few times." McGilvery did not sell heroin out of his home, but met with individuals at local stores to conduct the drug transactions. McGilvery would generally meet individuals at his house if they wanted to purchase large amounts of heroin such as 20 grams or more. McGilvery was also using, selling, and trading cocaine, crack cocaine, and

6

prescription pills such as Xanax and methadone. In 2012, McGilvery overdosed and spent some time in the hospital.

19. On January 21, 2013, agents of the Metropolitan Enforcement Group of Southwestern Illinois (MEGSI) and the Drug Enforcement Administration (DEA) executed a search warrant at the home of Perkins and Douglas W. Oliver located at 20 Kassing Drive, Fairview Heights, Illinois. The home at 20 Kassing Drive had been involved in numerous heroin related activities documented by the Fairview Heights Police Department dating back to 1999. In the spring and summer of 2012, two individuals died from suspected heroin overdoses at the residence. On September 5, 2012, Perkins and Oliver were arrested and ultimately charged with Concealment of a Death. On October 31, 2012, an Assignment Order was filed in the Perkins matter, transferring the case to **JUDGE COOK**. As Perkins and Oliver were co-defendants in the concealment case, your Affiant believes the Oliver case was also transferred to **JUDGE COOK**.

20. During the execution of the search warrant, McGilvery arrived at 20 Kassing Drive. McGilvery was taken into custody and transported to the Fairview Heights Police Department. When asked by your Affiant if McGilvery would provide a statement to law enforcement, McGilvery advised he wished to consult an attorney. McGilvery also advised he would contact your Affiant later that day or by the next day.

21. On February 8, 2013, Deborah A. Perkins (a 65 year old black female) was interviewed pursuant to a proffer agreement in the presence of her attorney. Perkins, a convicted felon, told your Affiant that she knew McGilvery had been using and selling heroin since 2005. In February, 2008, Perkins and McGilvery began going to Chicago once a week to purchase

7

heroin. Perkins estimated she and McGilvery made in excess of twenty trips to Chicago to acquire heroin, obtaining up to twenty-five grams per trip. Perkins and McGilvery were supposed to be "business partners." When Perkins and McGilvery returned from Chicago, Perkins would always give McGilvery all of the heroin they acquired. Perkins and McGilvery "parted ways" between September 2008 and April 2009.

22.  Perkins also stated that beginning in the summer of 2009 and continuing until the summer of 2010, she began to travel to Chicago on a weekly basis to acquire heroin. Perkins would generally travel to Chicago alone, but on two of those occasions McGilvery accompanied Perkins. Perkins and McGilvery would pool their money with which to purchase the heroin. During that year, McGilvery gave Perkins money to purchase anywhere from twenty-five grams to one hundred grams of heroin each time Perkins went to Chicago. While Perkins was taking trips to Chicago, McGilvery handled the "business aspects" of their partnership. McGilvery went to Chicago alone one time and purchased twenty-five grams of heroin. Sometime around Thanksgiving 2011, Perkins and McGilvery's business relationship changed in that they stopped pooling their money.

23.  Perkins continued, telling your Affiant that between Thanksgiving of 2011 and January 21, 2013, McGilvery would give Perkins between $2,500.00 and $5,000.00 every two weeks for Perkins to take to Chicago to purchase heroin. Several times Perkins received $3,500.00 from McGilvery. Perkins would acquire the heroin in Chicago and transport it to Fairview Heights, where McGilvery picked it up from Perkins. Perkins believed McGilvery quit selling heroin directly to customers seven or eight months ago. Still, McGilvery distributed heroin through an individual named Matt Heuer. In addition, every month for the past five or six

years, Perkins and McGilvery have purchased a hundred methadone pills from a friend of Perkins. Perkins kept 50 pills for herself and gave the remaining 50 pills to McGilvery.

24. Perkins further advised your Affiant she never knew McGilvery's customers, but knew McGilvery was selling heroin to a "professional person" who worked at the St. Clair County courthouse. Perkins did not know the name of the person from the courthouse to whom McGilvery was selling heroin, but believed the person was a white male and who was also an attorney. On one occasion, Perkins asked McGilvery to talk to "his boy" at the courthouse to see what was going on with Perkins' pending criminal charge for concealment of a death. Perkins was told by McGilvery that "his boy" informed him that St. Clair County had so many murders, approximately 69 to 80, that it did not have enough money to "try" them all and that Perkins did not have to worry.

25. Perkins went on to say that possibly in the summer of 2011, she went with McGilvery while McGilvery "served" a white male in his forties with at least a gram of heroin. The house they went to was located in Belleville, Illinois and had a swimming pool in the backyard.

26. Your Affiant is aware that **JUDGE COOK** lives at 1817 10th Fairway Drive in Belleville, Illinois. **JUDGE COOK's** residence also has a swimming pool in the backyard. Your Affiant also confirmed with MEGSI SA Aaron Nyman that a MEGSI investigation revealed Perkins was traveling to Chicago to acquire heroin.

27. On February 14, 2013, Douglas W. Oliver (a 47 year old black male) was interviewed pursuant to a proffer agreement in the presence of his attorney. Oliver, a convicted

9

felon, is the son of Perkins and knew McGilvery. Oliver also believed based on conversations with McGilvery that McGilvery knew someone in the State's Attorney's Office along with other officials who could provide McGilvery information on Oliver's pending criminal charge for concealment of a death. McGilvery told Oliver not to worry about his case because it was only a "probationable" matter and that Oliver would not be looking at serving a lot of time.

28. Oliver continued, saying sometime in March or April of 2012, Oliver asked McGilvery to get rid of 10 grams of heroin because Oliver was on probation and did not want to get in trouble. McGilvery gave Oliver $1,000.00 for the heroin. Within the two months prior to his interview, Oliver also provided methadone pills to McGilvery on three separate occasions. Oliver provided 30 pills per month to McGilvery. Oliver would then be paid by McGilvery for the pills.

29. On March 4, 2013, due to the fact that McGilvery and/or his attorney never contacted your Affiant, FBI SA Nicholas J. Manns and your Affiant made contact with McGilvery at one of his residences in Belleville, Illinois. During the contact, McGilvery stated he spoke with an attorney who advised him not to talk to the FBI. McGilvery never retained the attorney, but followed the attorney's advice and did not contact the FBI. During the contact, McGilvery provided his cellular telephone number as 618-806-0305, saying he has had the telephone number "for years." McGilvery indicated he wished to cooperate with the FBI and would contact an attorney by that Wednesday after which McGilvery or his attorney would likely be in contact with your Affiant.

30. On March 11, 2013, **AT&T** provided subscriber information and tolls records for 618-806-0305 for the time period March 10, 2012 to March 10, 2013, pursuant to an authorized

subpoena. **AT&T** advised that the subscriber information for 618-806-0305 is Linda Gibson of 112 South 35th Street, Belleville, Illinois with a home e-mail address of SEANDON007.SM14@GMAIL.COM. Your Affiant is aware that Gibson is McGilvery's mother. Your Affiant also knows Gibson utilizes a different cellular telephone number.

31. A review of the historic records showed more than 2,000 telephone calls and/or other electronic communications, to and from the 618-806-0305 (previously identified as the cellular telephone number for McGilvery) and to and from the **TARGET TELEPHONE** (previously identified as the cellular telephone number for **JUDGE COOK**) from March 10, 2012 to March 9, 2013. Moreover, the records showed cellular telephone 618-806-0305 (associated with McGilvery) contacting the **TARGET TELEPHONE** (associated with **JUDGE COOK**) within minutes of your Affiant and SA Manns leaving the contact with McGilvery on March 4, 2013.

32. On Sunday, March 10, 2013, former Assistant State's Attorney and newly elected St. Clair County Associate Circuit Judge, Joseph D. Christ (previously mentioned) died during a hunting trip with **JUDGE COOK** in Pike County, Illinois. Christ was 49 years old at the time of his death. The investigation of Christ's death was conducted by the Pike County Sheriff's Department. During the investigation, on March 15, 2013, Pike County Sheriff (and Coroner) Paul F. Petty met and spoke with **JUDGE COOK** at a restaurant in Belleville, Illinois. During the conversation, when asked about prior cocaine use, **JUDGE COOK** ultimately admitted using in the past, claiming he started his drug use after the death of a sibling. **JUDGE COOK** further admitted he used cocaine the day prior to Christ's death, after Christ brought it out as the two drove to their hunting trip in Pike County. An autopsy was performed on Christ to determine the

11

cause of death. Your Affiant reviewed a Report of Postmortem Examination (case number N-13-153) prepared by the Pike County Coroner's Office and which indicated the cause of death for Christ as being "cocaine intoxication."

33.     In reviewing the aforementioned **AT&T** records, your Affiant determined that the **TARGET TELEPHONE** (associated with **JUDGE COOK**) contacted cellular telephone number 618-806-0305 (associated with McGilvery) on March 8, 2013 at 10:33 a.m. and at 5:17 p.m. Furthermore, cellular telephone number 618-806-0305 (associated with McGilvery) contacted the **TARGET TELEPHONE** (associated with **JUDGE COOK**) on March 9, 2013 at 8:49 a.m.

34.     Your Affiant also determined the **AT&T** records indicated telephone number 618-447-6579 had multiple contacts with cellular telephone number 618-806-0305 (associated with McGilvery) on January 20, 2013 and January 29, 2013. Your Affiant is aware that telephone number 618-447-6579 was a cellular telephone number utilized by Christ.

35.     A review of **AT&T** records by your Affiant showed more than 35 telephone calls and/or electronic communications, to and from cellular telephone number 618-806-0305 (associated with McGilvery) and to and from the **TARGET TELEPHONE** (associated with **JUDGE COOK**) from April 6, 2013 to April 8, 2013. A further review of the **AT&T** records by your Affiant showed more than 80 telephone calls and/or electronic communications, to and from cellular telephone number 618-806-0305 (associated with McGilvery) and to and from the **TARGET TELEPHONE** (associated with **JUDGE COOK**) from April 13, 2013 to May 4, 2013.

36. On April 9, 2013, United States Magistrate Judge Clifford J. Proud signed a warrant (case number 13-M-6002-CJP) authorizing cellular telephone provider **AT&T Mobility** to collect and provide GPS tracking information on the **TARGET TELEPHONE** (associated with **JUDGE COOK**). In compliance with the authorized warrant, **AT&T Mobility** provided your Affiant with specific GPS coordinates/locations for the **TARGET TELEPHONE** (associated with **JUDGE COOK**) at regular intervals. In reviewing the data provided by **AT&T Mobility** for April 13, 2013 through May 6, 2013, your Affiant determined cellular telephone number 618-806-0305 (associated with McGilvery) was in close proximity to his current residence (located at 309 North 38th Street, Belleville, Illinois) on April 13, April 16, April 22, April 23, April 25, April 27, April 28, April 30, and May 2, 2013 when the **TARGET TELEPHONE** (associated with **JUDGE COOK**) was also in close proximity to McGilvery's residence. In addition, through law enforcement surveillance of **JUDGE COOK**, your Affiant confirmed **JUDGE COOK**'s physical presence at McGilvery's residence on April 16, April 19, April 23, April 25, April 26, April 27, April 28, April 29, May 1, and May 6, 2013.

37. The aforementioned warrant is set to expire on May 8, 2013. Your Affiant requests the aforementioned warrant be renewed for a period of 30 days for the purpose of collecting additional information on the **TARGET TELEPHONE** (associated with **JUDGE COOK**), specifically GPS coordinates/locations.

38. In my training and experience, I have learned that **AT&T Mobility** is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the cellular telephones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and

(2) cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise than E-911 Phase II data.

39.  Based on my training and experience, I know that **AT&T Mobility** can collect E-911 Phase II data about the location of the **TARGET TELEPHONE**, including by initiating a signal to determine the location of the **TARGET TELEPHONE** on **AT&T Mobility's** network or with such other reference points as may be reasonably available.

40.  Based on my training and experience, I know that **AT&T Mobility** can collect cell-site data about the **TARGET TELEPHONE.**

## AUTHORIZATION REQUEST

41.  Based on the foregoing, your Affiant requests that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A).

42.  Your Affiant further requests, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to

14

delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the **TARGET TELEPHONE** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2).

43. Your Affiant further requests that the Court direct **AT&T Mobility** to disclose to the government any information described in Attachment B that is within the possession, custody, or control of **AT&T Mobility**. Your Affiant also requests that the Court direct **AT&T Mobility** to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with **AT&T Mobility's** services, including by initiating a signal to determine the location of the **TARGET TELEPHONE** on **AT&T Mobility's** network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate **AT&T Mobility** for reasonable expenses incurred in furnishing such facilities or assistance.

44. Your Affiant further requests that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the **TARGET TELEPHONE** outside of daytime hours.

15

45. Your Affiant further requests that the Court order all papers in support of this application, including the Affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

_____
JULIE E. NEIGER
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on May ___, 2013.

_____
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF ILLINOIS



## ATTACHMENT A

### Property to Be Searched

1. The cellular telephone assigned call number **618-954-1016,** (the **"TARGET TELEPHONE"**), whose wireless service provider is **AT&T Mobility**, a company headquartered at **208 South Akard Street, Dallas, Texas.** The **TARGET TELEPHONE** is subscribed to and utilized by **MICHAEL N. COOK.**

2. Information about the location of the **TARGET TELEPHONE** that is within the possession, custody, or control of **AT&T Mobility,** including information about the location of the cellular telephone if it is subsequently assigned a different call number.

## ATTACHMENT B

### Particular Things to be Seized

All information about the location of the **TARGET TELEPHONE** described in Attachment A for a period of 30 days, during all times of day and night. "Information about the location of the **TARGET TELEPHONE**" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of **AT&T Mobility**, **AT&T Mobility** is required to disclose the Location Information to the government. In addition, **AT&T Mobility** must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with **AT&T Mobility's** services, including by initiating a signal to determine the location of the **TARGET TELEPHONE** on **AT&T Mobility's** network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate **AT&T Mobility** for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).